# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

FINDLAY INDUSTRIES, INC. and SARATOGA
LANE LLC, individually and on behalf of a class of
all others similarly situated,

|                          | Plaintiffs, |

v.

PANASONIC CORPORATION, PANASONIC
CORPORATION OF NORTH AMERICA,
MITSUBA CORPORATION, AMERICAN
MITSUBA CORPORATION, TOKAI RIKA CO.,
LTD., TRAM, INC., TOYO DENSO CO. LTD.,
WEASTEC, INC. and OMRON AUTOMOTIVE
ELECTRONICS CO., LTD.

Defendants.

Case No. _____

# CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiffs Findlay Industries, Inc. and Saratoga Lane LLC, individually and on behalf of a proposed class of direct purchasers of Switches, bring this class action against Defendants under the antitrust laws of the United States for treble damages and other relief and allege upon information and belief as follows.

## NATURE OF THE CASE

1.     This lawsuit is brought as a proposed class action against Defendants Panasonic Corporation, Panasonic Corporation of North America (together, the "Panasonic Defendants" or "Panasonic"), Mitsuba Corporation, American Mitsuba Corporation (together, the "Mitsuba Defendants" or "Mitsuba"), Tokai Rika, Co., Ltd., TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc.

(together, the "Tokai Defendants" or "Tokai"), Toyo Denso Co. Ltd., Weastec, Inc. (together, the "Toyo Defendants" or "Toyo"), and Omron Automotive Electronics Co., Ltd. ("Omron") (collectively "Defendants") and unnamed co-conspirators, manufacturers and/or suppliers of Switches (defined below) for engaging in a long-running conspiracy to unlawfully fix, artificially raise, maintain and/or stabilize prices, rig bids for, and allocate the market and customers in the United States for Switches.

2.     Plaintiffs seek to represent all persons and entities who, during the period from and including September 1, 2003, through the date of the filing of this Complaint (the "Class Period"), directly purchased Switches from one or more Defendants, any current or former subsidiary or affiliate of the Defendants or any co-conspirator of the Defendants.

3.     The Defendants manufacture, market, and sell Switches in and into the United States.  The Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to fix, raise, maintain and/or stabilize prices, and allocate market shares for Switches.

4.     The U.S. Department of Justice's ("DOJ") Antitrust Division is currently conducting a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ is seeking information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has participated in raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.  The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct.  The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded approximately $2.3

billion in criminal fines.  The European Commission Competition Authority ("EC") has also conducted dawn raids at the European offices of several automotive parts manufacturers.

5.      On October 30, 2012, the DOJ announced that Defendant Tokai Rika Co., Ltd. had agreed to plead guilty and to pay a $17.7 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of heater control panels ("HCPs") installed in automobiles sold in the United States and elsewhere.  Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

6.      In its plea agreement, Tokai Rika agreed to "cooperate fully and truthfully with . . . the current federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of HCPs or *steering wheel switches* . . . ."  Tokai Rika's guilty plea further provides that in exchange for its cooperation in the DOJ's automotive parts investigation, including with respect to steering wheel switches, the DOJ will refrain from criminally prosecuting Tokai Rika for price-fixing certain automotive parts, including *steering wheel switches*.

7.      On July 18, 2013, the DOJ announced that Defendant Panasonic Corporation had agreed to plead guilty and to pay a $45.8 million criminal fine for its role in a conspiracy to fix prices of automotive parts, including Switches, installed in automobiles sold in the United States and elsewhere.

8.      On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation agreed to plead guilty and to pay a $135 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of certain automotive parts installed in automobiles sold in the United States and elsewhere.

9.      Defendant Mitsuba Corporation's guilty plea defines automotive parts to include, among other parts, automotive electric switches.  Pursuant to its guilty plea, Mitsuba Corporation and its subsidiaries have pledged to cooperate in the DOJ's automotive parts investigation with respect to automotive electric switches.  Mitsuba Corporation's guilty plea further provides that in exchange for its cooperation in the DOJ's automotive parts investigation, including with respect to automotive electric switches, the DOJ will refrain from criminally prosecuting Mitsuba for price-fixing certain automotive parts, including automotive electric switches.

10.      On March 17, 2016, the DOJ announced that Omron had agreed to plead guilty to a one count criminal information and pay a $4.55 million criminal fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, power window switches sold to Honda Motor Co., Ltd. and its subsidiaries in the United States and elsewhere.  According to the Information, the combination and conspiracy engaged in by Omron and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

11.      The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Switches sold to automobile manufacturers and others in the United States.  The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

12.     As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiffs and Class (as defined herein) paid artificially inflated prices for Switches during the Class Period and have thereby suffered injury to their business and property.

## DEFINITIONS

13.     "Switches" mean switches used in motor vehicles and include one or more of the following:  steering wheel switches, turn switches, wiper switches, combination switches, door courtesy switches, and power window switches.

14.     "Class Period" means January 1, 2003 through the date of the filing of this Complaint.

## JURISDICTION AND VENUE

15.     Plaintiffs bring this action to recover treble damages, costs of suit, and reasonable attorneys' fees resulting from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

16.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

17.     Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

18.     The activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.

5

19.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District, (b) manufactured, sold, shipped, and delivered substantial quantities of Switches throughout the United States, including in this District, (c) had substantial contacts with the United States, including in this District, and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

### *Plaintiffs*

21.     Plaintiff Findlay Industries, Inc. is an Ohio corporation with its principal place of business in Findlay, Ohio.  Plaintiff purchased Switches directly from one or more of the Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

22.      Plaintiff Saratoga Lane LLC ("Saratoga") is an Illinois limited liability company with its principal place of business in Illinois.  By virtue of transfer and assignment, Saratoga is successor in interest to this claim of the Collins & Aikman Post-Consummation Trust of Collins & Aikman Corporation and its related debtor entities, including Collins & Aikman Products Co. ("Collins & Aikman"), which was a Michigan corporation with its principal place of business in Michigan. Collins & Aikman purchased Switches directly from one or more of the Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

## DEFENDANTS

### *The Panasonic Defendants*

23.     Defendant Panasonic Corporation is a Japanese company with its original place of business in Osaka, Japan.   Panasonic Corporation – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Switches that were purchased throughout the United States, including in this District, during the Class Period.

24.     Defendant Panasonic Corporation of North America is a Delaware corporation with its principal place of business in Secaucus, New Jersey.  It is a subsidiary of and wholly owned and/or controlled by its Japanese parent, Panasonic Corporation.  Panasonic Corporation of North America manufactured, marketed and/or sold Switches that were purchased throughout the United States, including in this District, during the Class Period.  Specifically, Panasonic Automotive Systems Company of America, a registered assumed name of Panasonic Corporation of North America, is a division of Panasonic Corporation of North America and supplies automotive parts, including Switches, to the North America automotive industry.  Panasonic Automotive Systems Company of America is headquartered in Peachtree City, Georgia and has its main sales office in Farming Hills, Michigan.

25.     At all times during the Class Period the activities of Panasonic Corporation of North America and Panasonic Automotive Systems Company of America were under the direction and control of Panasonic Corporation.

### *The Mitsuba Defendants*

26.     Defendant Mitsuba Corporation is a Japanese company with its principal place of business in Gunma, Japan.  Mitsuba Corporation – directly and/or through its subsidiaries, which

it wholly owned and/or controlled—manufactured, marketed and/or sold Switches that were purchased throughout the United States, including in this District, during the Class Period.

27.     Defendant American Mitsuba Corporation is an Illinois corporation with its principal place of business in Novi, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent, Mitsuba Corporation.  America Mitsuba Corporation manufactured, marketed, and/or sold Switches that were purchased throughout the United States, including in this District, during the Class Period.

28.     Mitsuba Corporation and American Mitsuba Corporation are presented to the outside world as one entity. "American Mitsuba Corporation" is represented on Mitsuba's website as "plant" and "office" for Mitsuba Corporation.  See https://www.mitsuba.co.jp/english/corp/group_overseas.html and http://www.americanmitsuba.com/About_Us.html .

29.     At all times during the Class Period the activities of American Mitsuba Corporation were under the direction and control of Mitsuba Corporation.

*The Tokai Rika Defendants*

30.     Defendant Tokai Rika Co., Ltd. is a Japanese company with its principal place of business in Toyota, Japan.  Tokai Rika Co., Ltd. – directly and/or through its subsidiaries, which it wholly owned and/or controlled – manufactured, marketed and/or sold Switches that were purchased throughout the United States, including in this district, during the Class Period.

31.     Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. is a Michigan corporation with its principal place of business in Plymouth, Michigan.  It is a subsidiary of and wholly owned and/or controlled by its parent Tokai Rika Co., Ltd.  During the Class Period, Defendant TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. manufactured, marketed and/or sold Switches that were purchased throughout the United States, including in this district, during the Class Period.

8

32.     Executives who have worked at Tokai Rika Co., Ltd. have also worked at TRAM, Inc.  For instance, Masayuki Morita, the President and Chief Operating Officer at TRAM, Inc. previously served as a Managing Director and Director at Tokai Rika Co., Ltd.  Yoshihei Iida, the former Chairman of the Board and Representative Director at Tokai Rika Co. Ltd., was also previously President of TRAM, Inc.

33.     The same year that TRAM was established in the U.S., Tokai Rika received its "QS9000 certification," a quality standard that was required by the three major U.S. auto manufacturers: Ford, GM, and Chrysler.

34.     At all times during the Class Period the activities of TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc. were under the direction and control of Tokai Rika Co., Ltd.

*Defendant Omron*

35.     Defendant Omron Automotive Electronics Co., Ltd. is a Japanese corporation with its principal place of business in Komaki.  Japan. Omron directly or through its subsidiaries, which it wholly owns or controls, manufactured, marketed, and sold Switches that were sold and purchased throughout the United States, including in this District, during the Class Period.

*The Toyo Denso Defendants*

36.     Defendant Toyo Denso Co. Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant Toyo directly and through its subsidiaries, which it wholly owned or controlled, manufactured, marketed, and sold Switches that were sold and purchased throughout the United States, including in this District, during the Class Period.

37.     Defendant Weastec, Inc. is an Ohio corporation with its principal place of business in Hillsboro, Ohio.  Weastec is a subsidiary of and wholly owned or controlled by its parent Defendant Toyo.  Defendant Weastec directly or through its subsidiaries, which it wholly

owned or controlled, manufactured, marketed, and sold Switches that were sold and purchased throughout the United States, including in this District, during the Class Period.

38.     At all times during the Class Period the activities of Weastec, Inc. were under the direction and control of Toyo Denso Co. Ltd.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

39.     The acts alleged in this Complaint to have been done by Panasonic Corporation of North America, Panasonic Automotive Systems Company of America, American Mitsuba Corporation, TRAM, Inc. d/b/a Tokai Rika U.S.A. Inc, and Weastec, Inc. were authorized, ordered, and condoned by their respective parent companies.

40.     The acts alleged to have been done by the Defendants and their co-conspirators were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

41.     Other persons and entities not named as defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the conspirators are named as defendants in this Complaint.

42.     Each Defendant acted as a principal or an agent of or for the other Defendants and their co-conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

43.     Each Defendant acted as the principal of or agent for the other Defendant with respect to the acts, violations, and common course of conduct alleged herein.

44.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, and individuals, the identities of which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

45.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or limited liability entity, the allegation means that the corporation or limited liability entity engaged in the act, deed or transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the corporation's or limited liability entity business or affairs.

## INTERSTATE TRADE AND COMMERCE

46.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

47.     During the Class Period, Defendants manufactured, sold, and shipped substantial quantities of Switches in a continuous and uninterrupted flow of interstate and foreign commerce.

## SWITCHES

48.     Switches include one or more of the following:  (i) the steering wheel switch, which is installed in the steering wheel of a vehicle and is operated by the driver of the vehicle to control functions within the vehicle; (ii) the turn switch, which is a lever switch installed behind the steering wheel of a vehicle and is operated by the driver of the vehicle to signal a left or right turn and control high/low beam selection; (iii) the wiper switch, which is a lever switch installed behind the steering wheel of a vehicle and is operated by the driver of the vehicle to activate the

vehicle's windshield wipers; (iv) the combination switch, which is a combination of the turn and wiper switches as one unit, sold together as a pair; (v) the door courtesy switch, which is a switch installed in the door frame of a vehicle that activates the courtesy lamp inside the vehicle when the vehicle door opens, and (vi) power window switches, which are switches that raise and lower an automobiles electric windows.  Examples of Switches manufactured by the Defendants are shown below.



Steering Wheel Switch      Combination Switch      Door Courtesy Switch

Power Window Switch

49.    Switches are installed by original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed in cars to replace worn out, defective or damaged Switches.

50.    OEMs purchase Switches directly from the Defendants.  Switches are also directly purchased by component manufacturers who then supply such systems to OEMs.  These

component manufacturers are often called "Tier 1 Suppliers". Switches may also be directly purchased by Tier II or Tier III Suppliers who then supply such systems to Tier I and Tier II Suppliers, respectively.

51.     When purchasing Switches, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers on a model-by-model basis for model specific parts. Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years. Typically, the bidding process for a particular model begins approximately three years prior to the start of production of a new model. OEMs procure parts for U.S.-manufactured vehicles both in Japan and the United States.

52.     The Defendants and their co-conspirators supplied Switches to OEMs and Tier 1, Suppliers for installation in vehicles and components of vehicles manufactured and sold in the United States. The Defendants and their co-conspirators manufactured Switches (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) outside of the United States for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) outside of the United States for installation in vehicles manufactured in Japan for export to and sale in the United States.

53.     During the Class Period, Defendants and their co-conspirators sold Switches directly OEMs, suppliers to OEMs including Tier 1 Suppliers, distributors, and other purchasers.

54.     During the Class Period, Defendants and their co-conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Switches. As a result of their unlawful conduct, Defendants did not compete, but instead conducted their business insulated from competition.

## THE CHARACTERISTICS OF THE MARKET FOR SWITCHES ARE CONDUCIVE TO COLLUSION

55.     The structure and other characteristics of the Switches market in the United States are conducive to a price-fixing agreement, and have made collusion particularly attractive in this market.  Specifically, several important economic characteristics of the market for Switches render it plausible that there was collusion among Defendants because the Switches market: (1) has high barriers to entry; (2) has inelasticity of demand, and (3) provides Defendants with opportunities for collusion.

### 1.      The Switches Market Has High Barriers to Entry

56.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

57.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Switches market.  A new entrant into the business would face costly and lengthy start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

58.     The Defendants own several patent s related to the manufacture of Switches. These patents place a significant and costly burden on potential new entrants, who must avoid infringing on the patents when entering the market with a new product.

59.     In addition, OEMs cannot change Switches suppliers randomly after a supplier is initially selected because the OEMs design the features of their vehicles so that Switches they purchase for a vehicle are then integrated with the electronics, mechanics and other features of

the particular vehicle model. Thus, the design must be synergized by Switches manufacturers and OEMs. It would be difficult for a new market entrant to do so.

### 2.     There is Inelasticity of Demand for Switches

60.    "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other. For example, demand is said to be "inelastic" if an increase in the price of a product result in only a small decline in the quantity sold of that product, if any. In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

61.    For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices. Otherwise, increased prices would result in declining sales, revenues, and profits, as customers purchased substitute products or declined to buy altogether. Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales revenue.

62.    Demand for Switches is highly inelastic because there are no close substitutes for these products. In addition, customers must purchase Switches as an essential part of a vehicle, even if the prices are at a supra-competitive level

### 3.  Opportunities for Collusion

63.    Defendants attended industry events that created opportunities to conspire. Such industry events have provided myriad opportunities to meet, conspire, and share information.

### 4.     These Market Characteristics Enabled Defendants to increase Prices for Switches in the Face of Declining Demand During the Class Period

64.    The Producer Price Index ("PPI") measures the average change over time in the prices received by domestic producers for their output. The chart below (see Figure 1) provides a 2004-2012 illustration of vehicle electrical and electronic equipment pricing. Because

Switches are part of a vehicle's electrical and electronic equipment, the PPI for vehicle electrical and electronic equipment is a good indicator of the change over time in the prices received by domestic producers of Switches.

65.     The PPI for vehicle electrical and electronic equipment indicates that the prices for Switches have increased during the Class Period.

66.     Meanwhile, according to data from Bloomberg, demand for automobiles in the United States has generally decreased during the Class Period.  From 2008 to 2009, at the height of the recession, the auto industry experienced a very significant 21% drop in demand.  See Figure 1.  The PPI for vehicle electrical and electronic equipment for the very same time period indicates that prices for Switches remained basically flat.  According to the law of supply and demand, prices during this period should have fallen, but instead they held steady.



Figure 1.

67.    In a competitive market, falling demand would lead to decreased prices because competitors would need to lower prices in order to attract customers and increase demand.  In a market where competitors have engaged in a conspiracy to fix prices, however, competitors do not lower prices even when faced with decreasing demand.   Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower priced competitors.

68.    The price of vehicle electrical and electronic equipment – and by extension Switches – increased during the Class Period, even during periods when demand decreased.  In a

competitive market, falling demand should not have resulted in steady (or rising – see the 2005-2007 period in Figure 1) prices for Switches.  Such anticompetitive price increases have resulted in Plaintiffs and members of the Classes paying supracompetitive prices.

## DEFENDANTS' ANTITRUST CONSPIRACY

69.    During the Class Period, Defendants and their co-conspirators conspired to rig bids for, to allocate the supply of, and to raise, fix and maintain prices for Switches sold in or into the United States.

70.    Defendants and their co-conspirators engaged in anticompetitive conduct in furtherance of the alleged conspiracy.

71.    Defendants and their co-conspirators participated in meetings, conversations, and communications to discuss bids and price quotations for Switches sold in or into the United States.

72.    Defendants and their co-conspirators agreed during their meetings, conversations, and communications to allocate among themselves the supply of Switches sold in or into the United States.

73.    Defendants sold Switches to customers in the United States and elsewhere at collusive and non-competitive prices.

74.    Defendants accepted payments for Switches sold in the United States and elsewhere at collusive and non-competitive prices.

75.    Defendants and their co-conspirators agreed during their meetings, conversations, and communications to coordinate price adjustments requested by motor vehicle manufacturers.

76.     Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

77.     Defendants and their co-conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

78.     Defendants and their co-conspirators affirmatively undertook measures to conceal their unlawful conduct.

79.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

80.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

81.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids and last for the life of a vehicle model (approximately five years).

82.     When OEMs purchase Switches directly from the supplier to whom they awarded the contract, the OEMs purchase the Switches at the winning price.

83.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Switches directly from the winning bidder for incorporation into products manufactured for and sold to OEMs.  Those suppliers and other direct purchasers who directly purchase Switches from the winning bidder pay the winning bidder at least the winning price. The OEM price sets the floor for pricing of Switches to direct purchasers.

84.     Defendants' conduct persisted for many years.  Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

85.     Among other conduct, Defendants manipulated the RFQ process to accomplish their conspiracy.

86.     As part of their conspiracy, at times Defendants agreed to submit bids that would allow the supplier that had the existing Switches business for a particular model to win the Switches business for the successor model.

87.     Defendants and their co-conspirators coordinated their Switches pricing.  They submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other.  They exchanged pricing information not just to ensure that the agreed-upon party would win the business, but also to ensure that the losing bidders would look competitive in order to have the opportunity to bid for future business.

88.     Defendants and their co-conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy.   These activities included, but were not limited to, the following:

a.      Agreeing to unlawfully coordinate pricing for, and allocate sales of, Switches.  For example, in responding to RFQs, Defendants and their co-conspirators agreed that the incumbent supplier would be the preferred bidder, and to price their bids to affect this agreement.

b.      Colluding with regard to RFQs for Switches business by agreeing on pricing and then communicating agreed-upon prices to Defendants' subsidiaries in the U.S., where the prices were submitted collusively.

c.      Discussing and exchanging pricing information with regard to Switches RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges and adjustments of Switches pricing before submission to OEMs in the United States and elsewhere.

89.      Defendants and their co-conspirators knew and intended that their actions regarding their sales of Switches to motor vehicle manufacturers would have a direct impact on prices for Switches sold to all direct purchasers in the United States.

90.      Defendants' single price-fixing conspiracy involving Switches impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Switches.

## ANTITRUST INVESTIGATION

### 5.      Government Investigations

91.      A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of automotive parts. A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that automotive parts supplier investigations by the JFTC, DOJ and EC would continue to widen because the automotive industry as a whole comprises many sub-industries. He characterized the investigations being conducted by the U.S., European and Japanese antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

92.     On October 30, 2012, the DOJ announced that Defendant Tokai Rika Co., Ltd. had agreed to plead guilty and to pay a $17.7 million criminal fine for its role in a conspiracy to rig bids for, and to fix, stabilize and maintain the prices of heater control panels ("HCPs") installed in automobiles sold in the United States and elsewhere. Tokai Rika also agreed to plead guilty to a charge of obstruction of justice related to the investigation of the antitrust violation.

93.     In its plea agreement, Tokai Rika agreed to "cooperate fully and truthfully with . . . the current federal investigation of violations of federal antitrust and related criminal laws involving the manufacture or sale of HCPs or steering wheel switches . . . ." Tokai Rika's guilty plea further provides that in exchange for its cooperation in the DOJ's automotive parts investigation, including with respect to steering wheel switches, the DOJ will refrain from criminally prosecuting Tokai Rika for price-fixing certain automotive parts, including steering wheel switches.

94.     With respect to the obstruction of justice count, the criminal information charged as follows:

> In or about February 2010, an executive of Defendant, acting on Defendant's behalf, knowingly and corruptly attempted to persuade and did persuade employees of Defendant, with intent to cause and induce them to alter, destroy, mutilate, and conceal objects with intent to impair the objects' integrity and availability for use in an official proceeding, that is the federal grand jury sitting in the Eastern District of Michigan investigating, among other things, possible federal criminal antitrust violations occurring in the automotive parts industry and committed by Defendants and others, in violation of 18 U.S.C. § 1512(b)(2)(B).

> After becoming aware of the FBI search of Defendant's United States subsidiary, an executive of Defendant directed employees to delete electronic data and destroy paper documents likely to contain evidence of antitrust crimes in the United States and elsewhere. As a result, electronic data were deleted and paper documents were destroyed, including data and documents evidencing antitrust crimes in the United States and elsewhere, and some of the deleted electronic data and destroyed paper documents were non-recoverable.

95.     On July 18, 2013, the DOJ announced that Defendant Panasonic Corporation agreed to pay a $45.8 million criminal fine and to plead guilty to a three-count criminal information charging it with participating in a conspiracy by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of automotive parts, including Switches sold to Toyota Motor Corporation and Toyota Motor Engineering & Manufacturing North America, Inc. (collectively, "Toyota") for installation in vehicles manufactured and sold in the United States and elsewhere from at least as early as September 2003 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

96.     According to the Information filed July 18, 2013, Defendant Panasonic Corporation and its co-conspirators carried out the Switches conspiracy by:

(a)     participating in meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to Toyota in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to Toyota in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of Switches sold to Toyota in the United States and elsewhere on a model-by-model bases;

(d)     agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by Toyota in the United States and elsewhere;

(e)     submitting bids, price quotations, and price adjustments to Toyota in the United States and elsewhere in accordance with the agreements reached;

      (f)     selling Switches to Toyota in the United States and elsewhere at collusive and noncompetitive prices;

      (g)     accepting payment for Switches sold to Toyota in the United States and elsewhere at collusive and noncompetitive prices;

      (h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

      (i)     employing measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection.

97.    According to the Plea Agreement filed August 7, 2013, Defendant Panasonic Corporation sold steering wheel switches, turn switches, combination switches and door courtesy switches to Toyota Motor Engineering & Manufacturing North America, Inc. through its United States subsidiary, which is located in the Eastern District of Michigan

98.    Additionally, on September 24, 2013, the DOJ announced that a Detroit Federal grand jury returned an indictment against an executive of Panasonic Automotive Systems Company of America, a division of Defendant Panasonic Corporation of North America, Shinichi Kotani, for his participation in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize and maintain the prices of, automotive parts, including Switches sold to Toyota for installation in vehicles manufactured and sold in the United States and elsewhere from at least as early as January 2004 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

99.     According to the Indictment filed September 24, 2013, Shinichi Kotani and his co-conspirators carried out the Switches conspiracy by:

(a)     participating in, and directing, authorizing, or consenting to the participation of subordinate employees in, meetings, conversations, and communications in the United States and Japan to discuss the bids and price quotations to be submitted to Toyota in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to Toyota in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of Switches sold to Toyota in the United States and elsewhere on a model-by-model basis;

(d)     approving collusive and noncompetitive prices agreed upon by subordinate during those meetings, conversations, and communications in the United States and elsewhere;

(e)     submitting bids and price quotations to Toyota in the United States and elsewhere in accordance with the agreements reached;

(f)     selling Switches to Toyota in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for Switches sold to Toyota in the United States and elsewhere at collusive and noncompetitive prices; and

(h)     engaging in meetings, conversations, and communications in the United States and Japan for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme.

100.    On September 26, 2013, the DOJ announced that Defendant Mitsuba Corporation agreed to pay a $135 million criminal fine and to plead guilty to a two-count criminal information charging it with obstruction of justice and participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of certain automotive parts sold to automobile manufacturers in the United States and elsewhere from at least as early as January 2000 and continuing until at least February 2010 in violation of the Sherman Act, 15 U.S.C. § 1.

101.    According to the Information filed, Defendant Mitsuba Corporation and its co-conspirators carried out the automotive parts conspiracy by:

(a)    participating in meetings, conversations, and communications in the United States and elsewhere to discuss the bids and price quotations to be submitted to automobile manufacturers[1] in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids and price quotations to be submitted to automobile manufacturers in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of certain automotive parts, sold to automobile manufacturers in the United States and elsewhere;

(d)    agreeing, during those meetings, conversations, and communications, to coordinate price adjustments requested by automobile manufacturers in the United States and elsewhere;

---

[1] For purposes of the Mitsuba Information, the term "automobile manufacturers" means Honda Motor Company Ltd., Fuji Heavy Industries Ltd., Nissan Motor Company Ltd., Toyota Motor Corporation and Chrysler Group, LLC and certain of their subsidiaries, suppliers and others.

(e)     submitting bids, price quotations, and price adjustments to automobile manufacturers in the United States and elsewhere in accordance with the agreements reached;

(f)     selling certain automotive parts to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(g)     accepting payment for certain automotive parts sold to automobile manufacturers in the United States and elsewhere at collusive and noncompetitive prices;

(h)     engaging in meetings, conversations, and communications in the United States and elsewhere for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging and price-fixing scheme; and

(i)     employing measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations.

102.    Defendant Mitsuba Corporation's guilty plea defines automotive parts to include, among other parts, automotive electric switches.  Pursuant to its guilty plea, Mitsuba Corporation and its subsidiaries have pledged to cooperate in the DOJ's automotive parts investigation, including with respect to automotive electric switches.  Mitsuba Corporation's guilty plea further provides that in exchange for its cooperation in the DOJ's automotive parts investigation, including with respect to automotive electric switches, the DOJ will refrain from criminally prosecuting Mitsuba for price-fixing certain automotive parts, including automotive electric switches.

103.    With respect to the obstruction of justice count, the criminal information charged as follows:

> In or about February 2010, Executive A, acting on Defendant's behalf, knowingly altered, destroyed, mutilated, concealed, covered up, falsified and made false entries in records, documents and tangible objects with the intent to impede, obstruct, and influence the investigation and proper

administration of a matter within the jurisdiction of a department and agency of the United States, to wit, an investigation by the FBI and the United States Department of Justice of possible violations of U.S. antitrust law, in relation to and contemplation of such matter and case, and furthermore did order and command other employees of the Defendant to do so, in violation of 18 U.S.C. § 1519.

After becoming aware of the FBI search of Defendant's co-conspirator's U.S. offices, Executive A informed certain of his subordinates employed at the U.S. subsidiary of Defendant about the FBI search, and instructed such subordinates, as well as other employees of Defendant, to locate, conceal and destroy documents and electronic files that were likely to contain evidence of antitrust crimes in the United States and elsewhere.

Executive A concealed and destroyed documents and electronic files in his possession, custody and control in the Eastern District of Michigan that were likely to contain evidence of antitrust crimes in the United States and elsewhere. Certain of Executive A's subordinates and other employees of Defendant took acts in the Eastern District of Michigan and elsewhere to endeavor to conceal and destroy such documents and electronic files in the possession, custody and control of Defendant, and did conceal and destroy such documents and electronic files.

104. Mitsuba Corporation's guilty plea also alleges that

Executive B of the defendant, a senior executive of the defendant and a member of the defendant's Board of Directors, and Executive C, a senior executive of the defendant, also became aware of the search and directed certain of their subordinates and other employees that documents and electronic files in the possession, custody and control of the defendant in Japan should be concealed and destroyed. Executive B's and C's subordinates and other employees took acts to conceal and destroy such evidence, and did conceal and destroy such evidence.

105. On March 17, 2016, the DOJ announced that Defendant Omron agreed to plead guilty to a one-count criminal information pay a $4.55 million criminal fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, rig bids for, and to fix, stabilize, and maintain the prices of power window switches sold to Honda for installation in Honda Civics. According to the plea agreement, although the conspiratorial discussions and meetings place throughout the

United States and elsewhere, representatives of Omron participated in at least one contact with its co-conspirators that occurred in the Eastern District of Michigan. The plea agreement further notes that the combination and conspiracy engaged in by Omron and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

106.    According to the Criminal Information, Defendant Omron and its co-conspirators carried out the conspiracy by:

(a)    participating in meetings, conversations, and communications to discuss bids to be submitted to Honda in the United States and elsewhere;

(b)    agreeing, during those meetings, conversations, and communications, on bids to be submitted to Honda in the United States and elsewhere;

(c)    agreeing, during those meetings, conversations, and communications, to allocate the supply of power window switches sold to Honda in the United States and elsewhere on a model be model basis;

(d)    submitting bids to Honda in the United States and elsewhere in accordance with the agreements reached;

(e)    selling power window switches to Honda in the United States and elsewhere at collusive and noncompetitive prices;

(f)    accepting payment for power window switches sold to Honda in the United States and elsewhere at collusive and noncompetitive prices;

(g)    engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging.

6.    **The Likely Existence of a Cooperating Defendant**

107.    The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

108.    In light of the multiple guilty pleas in this case, in related automotive parts antitrust cases and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

## CLASS ACTION ALLEGATIONS

109.    Plaintiffs bring this action on behalf of themselves, and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representatives of a Class defined as follows:

> All direct purchasers of Switches (excluding Defendants and their past and present parents, subsidiaries, affiliates or joint-ventures) in the United States from any of the Defendants (or their controlled subsidiaries, affiliates, or joint-ventures) during the Class Period.

110.    Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  The exact number of Class members is unknown to Plaintiffs.  The identity of the members of the Class can be readily determined from information and records Defendants possess or control through their subsidiaries, affiliates or joint ventures.

111.    Plaintiffs' claims are typical of the claims of the members of the Class.  Plaintiffs and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they have paid artificially inflated prices for Switches as a result of Defendants' anticompetitive and unlawful conduct.

112.    Plaintiffs will fairly and adequately protect and represent the interests of the Class.  Plaintiffs' interests are coincident with, and not antagonistic to, those of the Class.

113.    Plaintiffs are represented by counsel experienced and competent in the prosecution of antitrust class action litigation.

114.    Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members, because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

115.    There are core questions of law and fact common to the Class, such as:

    a.    Whether Defendants conspired to fix, raise, maintain, or stabilize prices of, to allocate, or to rig bids for, Switches;

    b.    Who participated in the conspiracy and how long it lasted;

    c.    Whether the conspiracy caused Switches prices to be higher than they otherwise would have been;

    d.    Whether Defendants' conduct caused injury to the business or property of Plaintiffs and members of the Class;

    e.    Whether Defendants' conduct violated Section 1 of the Sherman Act;

    f.    Whether Defendants undertook actions to conceal their unlawful conspiracy; and

    g.    How to measure the damages suffered by the Class.

116.    A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable.  Individual litigation presents the potential for inconsistent judgments and would greatly increase

the cost and duration of litigation for all parties and for the judicial system.  A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

## ANTITRUST INJURY SUFFERED BY PLAINTIFFS AND THE CLASS

117.    Defendants' anticompetitive conduct has had the following effects:

a.    price competition has been restrained, suppressed, or eliminated with respect to Switches;

b.    the prices of Switches have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.    purchasers have been deprived of free and open competition in the Switches market.

118.    As a result of Defendants' contract, combination, or conspiracy, Plaintiffs and other Class members paid higher prices for Switches than they would have in the absence of the conspiracy, and Plaintiffs and other Class members have sustained injury to their business or property.

## PLAINTIFFS' CLAIMS ARE TIMELY

A.    <u>The Statute of Limitations Did Not Begin to Run Because Plaintiffs Did Not And Could Not Discover Their Claims</u>

119.    Plaintiffs repeat and re-allege the allegations set forth above.

120.    Plaintiffs and the members of the Classes had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) July 18, 2013, the date that the DOJ publicly announced Defendant Panasonic Corporation's anticipated guilty plea.

121.    Plaintiffs and the members of the Classes are purchasers who purchased or leased automobiles or purchased Switches to replace or repair damaged or defective Switches in their automobiles.  They had no direct contact or interaction with the Defendants in this case and had no means from which they could have discovered the combination and conspiracy described in this Complaint before July 18, 2013, the date that the DOJ publicly announced Defendant Panasonic Corporation's anticipated guilty plea.

122.    No information in the public domain was available to the Plaintiffs and the members of the Classes prior to July 18, 2013, the date that the DOJ publicly announced Defendant Panasonic Corporation's anticipated guilty plea, that revealed sufficient information to suggest that the Defendants were involved in a criminal conspiracy to price-fix and rig bids for Switches.  Plaintiffs and the members of the Classes had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

123.    For these reasons, the statute of limitations as to Plaintiffs' and the Classes' claims did not begin to run, and has been tolled with respect to the claims that Plaintiffs and the members of the Classes have alleged in this Complaint.

### B.    Fraudulent Concealment Tolled the Statute of Limitations

124.    In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiffs and the Classes.  Plaintiffs and the members of the Classes did not discover, and could not discover through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until July 18, 2013, the date that the DOJ publicly announced Defendant Panasonic Corporation's anticipated guilty plea.

125.    Before that time, Plaintiffs and members of the Classes were unaware of the Defendants' unlawful conduct, and did not know before then that they were paying supracompetitive prices for Switches throughout the United States during the Class Period.  No information, actual or constructive, was ever made available to Plaintiffs and the members of the Classes that even hinted to Plaintiffs that they were being injured by the Defendants' unlawful conduct.

126.    The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

127.    Specifically, as Attorney General Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the Automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

128.    And, as stated in the Information filed against Defendant Panasonic Corporation, the Defendants and their co-conspirators employed "measures to keep their conduct secret, including using code names and choosing meeting places and times to avoid detection."  The Information filed against Mitsuba Corporation also states that the Defendants and their co-conspirators employed "measures to keep their conduct secret, including, but not limited to, using code names and meeting at remote locations."

129.    Also, Mitsuba Corporation pleaded guilty to a charge of obstruction of justice in which it explicitly admitted to "altering, destroying, mutilating, concealing, covering up, falsifying and making false entries in documents and tangible objects with the intent to impede, obstruction, and influence" the DOJ's investigation into the price-fixing of several automotive parts, including Windshield Washer Systems.  According to Mitsuba Corporation's plea agreement, in February 2010, three of Mitsuba's senior executives learned that the offices of a co-

conspirator had been searched by law enforcement authorities in connection with an investigation of possible antitrust violations, and they directed their subordinates and other employees to "conceal and destroy documents and electronic files" in the United States and Japan. Mitsuba Corporation's plea agreement confirmed that such evidence was concealed and destroyed.

130.    Additionally, Tokai Rika pleaded guilty to a charge of obstruction of justice in which it explicitly admitted that a Tokai Rika executive, acting on Tokai Rika's behalf "knowingly and corruptly attempted to persuade and did persuade employees of [Tokai Rika], with intent to cause and induce them to alter, destroy, mutilate, and conceal objects with intent to impair the objects' integrity and availability for use" in the DOJ's investigation into possible federal criminal antitrust violations occurring in the automotive parts industry. According to Tokai Rika's plea agreement, at the executive's direction, employees deleted electronic data and destroyed paper documents likely to contain evidence of antitrust crimes and as a result "electronic data was deleted and paper documents were destroyed, including data and documents evidencing antitrust crimes."

131.    By its very nature, the Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing. Switches are not exempt from antitrust regulation, and thus, before July 18, 2013, Plaintiffs reasonably considered the Switches industry to be a competitive industry. Accordingly, a reasonable person under the circumstances would not have been alerted to begin to investigate the legitimacy of the Defendants' Switches prices before July 18, 2013.

132.    Plaintiffs and the members of the Classes could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and

their co-conspirators to avoid detection of, and fraudulently conceal, their contract, combination, or conspiracy.

133.    Because the alleged conspiracy was both self-concealing and affirmatively concealed by the Defendants and their co-conspirators, Plaintiffs and members of the Classes had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until July 18, 2013, the date that the DOJ publicly announced Defendant Panasonic Corporation's anticipated guilty plea.

134.    For these reasons, the statute of limitations applicable to Plaintiffs' claims has been tolled.

**COUNT I:  CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT**

135.    Plaintiffs incorporate by reference the allegations set forth above as if fully set forth here.

136.    Defendants entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

137.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

138.    Commencing at least as early as January 1, 2003, and continuing for many years, the exact dates being currently unknown to Plaintiffs, Defendants entered into a continuing agreement, understanding, or conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Switches, creating anticompetitive effects.

139.    Defendants' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Switches throughout the United States.

140.    As a result of the conspiracy alleged herein, the prices charged to Plaintiffs and the other members of the Class for Switches were unlawfully raised, fixed, maintained, or stabilized in the United States.

141.    The conspiracy has had the following effects:

a.      prices paid by Plaintiffs and the Class for Switches were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.      Plaintiffs and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Switches; and

c.      competition in the market for Switches has been unlawfully restrained, suppressed, or eliminated.

142.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiffs and the Class have been damaged, and will continue to be damaged, by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

143.    The conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that the Court enter judgment in their favor and in favor of the Class herein, and respectfully request the following relief:

37

A.      That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiffs as the designated Class representatives and their counsel as Class Counsel;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      That Plaintiffs and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiffs and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiffs and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiffs and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiffs and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiffs demand a trial by jury of all issues so triable.

Dated: July 18, 2017

/s/ David H. Fink_____
David H. Fink (P28235)
Darryl Bressack (P67820)
Nathan J. Fink (P75185)
FINK + ASSOCIATES LAW
38500 Woodward Avenue; Suite 350
Bloomfield Hills, MI 48304
Telephone: (248) 971-2500
dfink@finkandassociateslaw.com
dbressack@finkandassociateslaw.com
nfink@finkandassociateslaw.com

Interim Liaison Counsel for the Direct
Purchaser Plaintiffs

Gregory P. Hansel
Randall B. Weill
Michael S. Smith
PRETI, FLAHERTY, BELIVEAU
   & PACHIOS LLP
One City Center
P.O. Box 9546
Portland, ME 04112-9546
Telephone: (207) 791-3000
ghansel@preti.com
rweill@preti.com
jmermin@preti.com
msmith@preti.com

Joseph C. Kohn
William E. Hoese
Douglas A. Abrahams
KOHN, SWIFT & GRAF, P.C.
One South Broad Street, Suite 2100
Philadelphia, PA 19107
Telephone: (215) 238-1700
jkohn@kohnswift.com
whoese@kohnswift.com
dabrahams@kohnswift.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN & KODROFF
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkattorneys.com
bcaldes@ srkattorneys.com
jjagher@ srkattorneys.com
jspector@ srkattorneys.com

Interim Co-Lead Counsel for
Direct Purchaser Plaintiffs

Joseph M. Fischer
CARSON FISCHER, P.L.C.
4111 Andover Road West - Second Floor
Bloomfield Hills, MI 48302-1924
Telephone:  (248) 644-4840
jfischer@carsonfischer.com

Solomon B. Cera
Thomas C. Bright
Pamela A. Markert
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230

Counsel for Plaintiffs