## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

| | | |
|---|---|---|
| In Re: AUTOMOTIVE PARTS ANTITRUST LITIGATION | : : : | 12-md-02311 Honorable Marianne O. Battani |
| In Re: SWITCHES CASES | : : : | |
| THIS RELATES TO: *Direct Purchaser Actions* | : : : | 2:17-cv-12338-MOB-MKM |

**AMENDED CLASS ACTION COMPLAINT AND DEMAND FOR JURY TRIAL**

Plaintiff Findlay Industries, Inc., individually and on behalf of a proposed class of direct purchasers of Power Window Switches, brings this class action against Defendants under the antitrust laws of the United States for treble damages and other relief, and alleges upon information and belief as follows.

**NATURE OF THE CASE**

1.     This lawsuit is brought as a proposed class action against Defendant Toyo Denso Co. Ltd., and Weastec, Inc. (together, the "Toyo Defendants" or "Toyo"), and Omron Automotive Electronics Co., Ltd. ("Omron") (collectively "Defendants"), and unnamed co-conspirators, manufacturers and/or suppliers of Power Window Switches (defined below) for engaging in a long-running conspiracy to unlawfully fix and to artificially raise, maintain and/or stabilize prices and to rig bids and allocate the market and customers in the United States for Power Window Switches.

2.     Plaintiff seeks to represent all persons and entities who, during the period from and including September 1, 2003, through the date of the filing of this Complaint (the "Class Period"), directly purchased Power Window Switches from one or more Defendants or any of their current or former subsidiaries.

3.     The Defendants manufacture, market, and sell Power Window Switches in and into the United States.  The Defendants and other co-conspirators (as yet unknown) agreed, combined and conspired to unlawfully fix and artificially raise, maintain and/or stabilize prices and to rig bids and allocate market shares for Power Window Switches.

4.     The U.S. Department of Justice's ("DOJ") Antitrust Division has conducted a broad criminal investigation into illegal price-fixing and bid-rigging in the automotive parts industry.  As part of its criminal investigation, the DOJ has sought information about unlawful anticompetitive conduct in the market for a number of different but related automotive parts, and the Federal Bureau of Investigation ("FBI") has conducted raids, pursuant to search warrants, carried out in the offices of a number of major competitors in the automotive parts industry.  The automotive parts investigation is the largest criminal investigation the Antitrust Division has ever pursued, both in terms of its scope and the potential volume of commerce affected by the alleged illegal conduct.   The ongoing cartel investigation of price-fixing and bid-rigging in the automotive parts industry has yielded approximately $2.3 billion in criminal fines.   The European Commission Competition Authority has also conducted dawn raids at the European offices of several automotive parts manufacturers.

5.     On March 17, 2016, the DOJ announced that Omron had agreed to plead guilty to a one count criminal information and pay a $4.55 million criminal fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts

industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Power Window Switches sold to Honda Motor Co., Ltd. and its subsidiaries in the United States and elsewhere.  According to the Information, the combination and conspiracy engaged in by Omron and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

6.      The Defendants and their co-conspirators participated in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to rig bids for, and to fix, stabilize, and maintain the prices of, Power Window Switches sold to automobile manufacturers and others in the United States.  The combination and conspiracy engaged in by the Defendants and their co-conspirators was in unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Antitrust Act, 15 U.S.C. § 1.

7.      As a direct result of the anticompetitive and unlawful conduct alleged herein, Plaintiff and members of the Class (as defined herein) paid artificially inflated prices for Power Window Switches during the Class Period and have thereby suffered injury to their business and property.

## DEFINITIONS

8.      "Power Window Switches" are switches that raise or lower an automobile's windows.

9.      "Class Period" means January 1, 2003 through the date of the filing of this Amended Complaint.

## JURISDICTION AND VENUE

10.     Plaintiff brings this action to recover treble damages, costs of suit, and reasonable attorneys' fees resulting from Defendants' violations of the Sherman Act, 15 U.S.C. § 1.

11.     This Court has subject matter jurisdiction pursuant to 15 U.S.C. §§ 15 and 26, and 28 U.S.C. §§ 1331, 1332(d) and 1337.

12.     Venue is proper in this district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. §§ 1391 (b), (c) and (d), because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more of the Defendants reside in, are licensed to do business in, are doing business in, had agents in, are found in, or transact business in this District.

13.     The activities of Defendants and their co-conspirators were within the flow of, and were intended to and did have a substantial effect on, the interstate commerce of the United States.

14.     This Court has *in personam* jurisdiction over each of the Defendants because, *inter alia,* each Defendant: (a) transacted business throughout the United States, including in this District; (b) manufactured, sold, shipped, and delivered substantial quantities of Power Window Switches throughout the United States, including in this District; (c) had substantial contacts with the United States, including in this District; and (d) was engaged in an illegal scheme and price-fixing conspiracy that was directed at, and had the intended effect of causing injury to, persons and entities residing in, located in, or doing business throughout the United States, including in this District.

## THE PARTIES

### *Plaintiff*

15.     Plaintiff Findlay Industries, Inc. is an Ohio corporation with its principal place of business in Findlay, Ohio.  Plaintiff purchased Power Window Switches directly from one or

more of the Defendants during the Class Period and suffered injury as a result of Defendants' unlawful conduct.

*Defendant Omron*

16.     Defendant Omron Automotive Electronics Co., Ltd. is a Japanese corporation with its principal place of business in Komaki, Japan. Omron, directly or through its subsidiaries, which it wholly owns or controls, manufactured, marketed, and sold Power Window Switches that were sold and purchased throughout the United States, including in this District, during the Class Period.

*The Toyo Denso Defendants*

17.     Defendant Toyo Denso Co. Ltd. is a Japanese corporation with its principal place of business in Tokyo, Japan.  Defendant Toyo Denso Co. Ltd., directly and through its subsidiaries, which it wholly owned or controlled, manufactured, marketed, and sold Power Window Switches that were sold and purchased throughout the United States, including in this District, during the Class Period.

18.     Defendant Weastec, Inc. is an Ohio corporation with its principal place of business in Hillsboro, Ohio.  Defendant Weastec, Inc. is a subsidiary of and is wholly owned or controlled by its parent, Defendant Toyo Denso Co. Ltd.  Defendant Weastec, Inc., directly or through its subsidiaries, which it wholly owned or controlled, manufactured, marketed, and sold Power Window Switches that were sold and purchased throughout the United States, including in this District, during the Class Period.

19.     At all times during the Class Period the activities of Weastec, Inc. were under the direction and control of Toyo Denso Co. Ltd.

## DEFENDANTS' CO-CONSPIRATORS AND AGENTS

20.     The acts alleged in this Complaint to have been done by Defendants were authorized, ordered, and condoned by their respective parent companies.

21.     The acts alleged to have been done by the Defendants and their co-conspirators were authorized, ordered and performed by their officers, directors, agents, employees or representatives while engaged in the management, direction, control or transaction of Defendants' business affairs.

22.     Other persons and entities not named as defendants have participated as co-conspirators in the violations alleged herein and have performed acts and made statements in furtherance thereof.  The Defendants are jointly and severally liable for the acts of their co-conspirators whether or not the conspirators are named as defendants in this Complaint.

23.     Each Defendant acted as a principal or an agent of or for the other Defendants and their co-conspirators with respect to the acts, violations, and common course of conduct alleged in this Complaint.

24.     Each Defendant acted as the principal of or agent for the other Defendants with respect to the acts, violations, and common course of conduct alleged herein.

25.     Various persons, partnerships, sole proprietors, firms, corporations and individuals not named as defendants in this lawsuit, the identities of whom or which are presently unknown, have participated as co-conspirators with the Defendants in the offenses alleged in this Complaint, and have performed acts and made statements in furtherance of the conspiracy or in furtherance of the anti-competitive conduct.

26.     Whenever in this Complaint reference is made to any act, deed or transaction of any corporation or other entity, the allegation means that the entity engaged in the act, deed or

transaction by or through its officers, directors, agents, employees or representatives while they were actively engaged in the management, direction, control or transaction of the entity's business or affairs.

### INTERSTATE TRADE AND COMMERCE

27.     The activities of Defendants and their co-conspirators, as described in this Complaint, were within the flow of, and substantially affected, interstate commerce.

28.     During the Class Period, Defendants manufactured, sold, and shipped substantial quantities of Power Window Switches in a continuous and uninterrupted flow of interstate and foreign commerce.

### POWER WINDOW SWITCHES

29.     An example of a Power Window Switch is shown below.



Power Window Switch

30.     Power Window Switches are installed by original equipment manufacturers ("OEMs") in new cars as part of the automotive manufacturing process.  They are also installed in cars to replace worn out, defective or damaged Power Window Switches.

31.     OEMs purchase Power Window Switches directly from the Defendants.  Power Window Switches are also directly purchased by component manufacturers who then supply them to OEMs.  These component manufacturers are often called "Tier 1 Suppliers."  Power Window Switches may also be directly purchased by Tier II or Tier III Suppliers, who then supply them to Tier I and Tier II Suppliers, respectively.

32.     When purchasing Power Window Switches, OEMs issue Requests for Quotation ("RFQs") to automotive parts suppliers.  Automotive parts suppliers submit quotations, or bids, to OEMs in response to RFQs, and the OEMs usually award the business to the selected automotive parts supplier for the lifespan of the model, which is usually four to six years.  Typically, the bidding process for a particular model begins approximately three years prior to the start of production of a new model.  OEMs procure parts for U.S.-manufactured vehicles both in Japan and in the United States.

33.     The Defendants and their co-conspirators supplied Power Window Switches to OEMs and Tier 1 Suppliers for installation in vehicles and components of vehicles manufactured and sold in the United States.  The Defendants and their co-conspirators manufactured Power Window Switches (a) in the United States for installation in vehicles manufactured and sold in the United States, (b) outside of the United States for export to the United States and installation in vehicles manufactured and sold in the United States, and (c) outside of the United States for installation in vehicles manufactured in Japan for export to and sale in the United States.

34.     During the Class Period, Defendants and their co-conspirators sold Power Window Switches directly to OEMs, to suppliers to OEMs (including Tier 1 Suppliers), to distributors, and to other purchasers.

35.     During the Class Period, Defendants and their co-conspirators, who in a competitive market would be horizontal competitors, engaged in a conspiracy to rig bids for and to raise, fix, maintain, or stabilize prices of Power Window Switches.  As a result of their unlawful conduct, Defendants did not compete, but instead conducted their business insulated from competition.

### THE CHARACTERISTICS OF THE MARKET FOR POWER WINDOW SWITCHES ARE CONDUCIVE TO COLLUSION

36.     The structure and other characteristics of the Power Window Switches market in the United States are conducive to a price-fixing agreement and have made collusion particularly attractive in this market.  Specifically, several important economic characteristics of the market for Power Window Switches render it plausible that there was collusion among Defendants: the Power Window Switches market (1) has high barriers to entry; (2) has inelasticity of demand; and (3) provides Defendants with opportunities for collusion.

**A.      The Power Window Switches Market Has High Barriers to Entry**

37.     A collusive arrangement that raises product prices above competitive levels would, under basic economic principles, be expected to attract new entrants seeking to benefit from the supra-competitive pricing.  Where, however, there are significant barriers to entry, new entrants are less likely.  Thus, barriers to entry help to facilitate the formation and maintenance of a cartel.

38.     There are substantial barriers that preclude, reduce, or make more difficult entry into the Power Window Switches market.  A new entrant into the business would face high start-up costs, including multi-million dollar costs associated with manufacturing plants and equipment, energy, transportation, distribution infrastructure, and long-standing customer relationships.

39.     The Defendants own several patents related to the manufacture of Power Window Switches.  These patents would place a significant and costly burden on potential new entrants, who would have to take steps to avoid infringing them when entering the market with a new product.

40.     In addition, it is no simple matter for an OEM to change Power Window Switches suppliers after a supplier has been initially selected.  This is because the OEMs design the features of their vehicles so that the Power Window Switches they purchase for a vehicle are then integrated with the electronics, mechanics and other features of the particular vehicle model. Thus, the design must be coordinated between Power Window Switches manufacturers and OEMs.  It would be difficult for a new market entrant to propose a design or to manufacture a Power Window Switch for an OEM without prior experience with the OEM for that part.

**B.     Demand for Power Window Switches Is Inelastic**

41.     "Elasticity" is a term used to describe the sensitivity of supply and demand to changes in one or the other.  For example, demand is said to be "inelastic" if an increase in the price of a product results in only a small decline (if any) in the quantity sold of that product.  In other words, customers have nowhere to turn for alternative, cheaper products of similar quality, and so continue to purchase despite a price increase.

42.     For a cartel to profit from raising prices above competitive levels, demand must be relatively inelastic at competitive prices.  Otherwise, increased prices would result in declining sales, meaning that revenues and profits might not increase, as customers purchased substitute products or declined to buy altogether.  Inelastic demand is a market characteristic that facilitates collusion, allowing producers to raise their prices without triggering customer substitution and lost sales.

43.     Demand for Power Window Switches is highly inelastic because there are no close substitutes for these products.  In addition, direct purchasers have no choice but to purchase Power Window Switches, because they are an essential part of a vehicle, even if their prices are at a supra-competitive level

C.     **Opportunities for Collusion**

44.     Defendants attended industry events that created opportunities to conspire.  Such industry events have provided myriad opportunities to meet, conspire, and share information.

D.     **These Market Characteristics Enabled Defendants to Increase Prices for Power Window Switches in the Face of Declining Demand During the Class Period**

45.     The Producer Price Index ("PPI") measures the average change over time in the prices received by domestic producers for their output.  The chart below (*see* Figure 1) shows the pricing of vehicle electrical and electronic equipment over the 2004-2012 period.  Because Power Window Switches are part of a vehicle's electrical and electronic equipment, the PPI for vehicle electrical and electronic equipment is a good indicator of the change over time in the prices received by domestic producers of Power Window Switches.

46.     The increase in the PPI for vehicle electrical and electronic equipment is evidence that the prices for Power Window Switches have increased during the Class Period.

47.     Meanwhile, according to data from Bloomberg, demand for automobiles in the United States decreased during the Class Period.  From 2008 to 2009, at the height of the recession, the auto industry experienced a very significant 21% drop in demand.  *See* Figure 1.  The PPI for vehicle electrical and electronic equipment for the same time period indicates that prices for Power Window Switches remained basically flat.  According to the law of supply and demand, because demand was falling during this period, prices should have fallen too—but instead they held steady.

11



Figure 1.

48.     In a competitive market, falling demand would lead to decreased prices, because competitors would need to lower prices in order to attract customers and increase demand.  In a market where competitors have conspired to fix prices, however, competitors do not lower prices even when faced with decreasing demand.  Such price decreases are unnecessary because the conspirators know that they will not lose sales to lower-priced competitors.

49.     The price of vehicle electrical and electronic equipment–and by extension, Power Window Switches–increased during the Class Period, even during periods when demand decreased.  In a competitive market, falling demand should not have resulted in steady (or

rising–see the 2005-2007 period in Figure 1) prices for Power Window Switches.  Defendants'
anticompetitive price increases have resulted in Plaintiff and members of the Class paying
supracompetitive prices.

## DEFENDANTS' ANTITRUST CONSPIRACY

50.     During the Class Period, Defendants and their co-conspirators conspired to rig
bids for, to allocate the supply of, and to raise, fix and maintain prices for Power Window
Switches sold in or into the United States.

51.     Defendants and their co-conspirators engaged in anticompetitive conduct in
furtherance of the alleged conspiracy.

52.     Defendants and their co-conspirators participated in meetings, conversations, and
communications to discuss bids and price quotations for Power Window Switches sold in or into
the United States.

53.     Defendants and their co-conspirators agreed during their meetings, conversations,
and communications to allocate among themselves the supply of Power Window Switches sold
in or into the United States.

54.     Defendants sold Power Window Switches to customers in the United States and
elsewhere at collusive and non-competitive prices.

55.     Defendants accepted payments for Power Window Switches sold in the United
States and elsewhere at collusive and non-competitive prices.

56.     Defendants and their co-conspirators agreed during their meetings, conversations,
and communications to coordinate price adjustments requested by motor vehicle manufacturers.

57.     Defendants and their co-conspirators submitted bids, price quotations, and price adjustments to motor vehicle manufacturers in the United States and elsewhere in accordance with their conspiratorial agreements.

58.     Defendants and their co-conspirators held meetings and conversations to monitor and police their bid-rigging and price-fixing conspiracy.

59.     Defendants and their co-conspirators affirmatively undertook measures to conceal their unlawful conduct.

60.     Defendants accomplished their conspiracy, in part, by rigging bids they made in response to RFQs.

61.     The RFQ process is designed to obtain independent bids from multiple suppliers. The OEM RFQ process generally works as follows: (1) the OEM issues the RFQ to multiple parts suppliers; (2) the suppliers submit bids; (3) depending on the OEM and product, the OEM and suppliers may revise the technical specifications and the pricing; (4) the suppliers submit revised bids; and (5) the OEM selects the winner.

62.     Generally, RFQ contracts are awarded to suppliers that submit the lowest bids, and last for the life of a vehicle model (approximately five years).

63.     When OEMs purchase Power Window Switches directly from the supplier to whom they awarded the contract, the OEMs purchase the Power Window Switches at the winning price.

64.     That winning price is also used when OEM suppliers that were not part of the RFQ process purchase Power Window Switches directly from the winning bidder for incorporation into products manufactured for and sold to OEMs.  Those suppliers and other direct purchasers who directly purchase Power Window Switches from the winning bidder pay

the winning bidder at least the winning price.  The OEM price sets the floor for pricing of Power Window Switches to direct purchasers.

65.     Defendants' conduct persisted for many years.  Had governmental authorities in the United States and abroad not launched an antitrust investigation into anticompetitive conduct in the market for motor vehicle parts, it is likely that the conspiracy would have continued undetected.

66.     Among other conduct, Defendants manipulated the RFQ process to accomplish their conspiracy.

67.     As part of their conspiracy, at times Defendants agreed to submit bids that would allow the supplier that had the existing Power Window Switches business for a particular model to win the Power Window Switches business for the successor model.

68.     Defendants and their co-conspirators coordinated their Power Window Switches pricing.  They submitted responses to RFQs that incorporated changes to pricing based on the conspiratorial agreements they made with each other.  They exchanged pricing information not just to ensure that the agreed-upon party would win the business, but also to ensure that the losing bidders would look competitive in order to have the opportunity to bid for future business.

69.     Defendants and their co-conspirators communicated, held meetings, and reached conspiratorial agreements in furtherance of their price-fixing conspiracy. These activities included, but were not limited to, the following:

      a.     Agreeing to unlawfully coordinate pricing for, and to allocate sales of, Power Window Switches.  For example, in responding to RFQs, Defendants and their co-conspirators agreed that the incumbent supplier would be the preferred bidder, and to price their bids to effect this agreement.

15

b.    Colluding with regard to RFQs for Power Window Switches business by agreeing on pricing and then communicating agreed-upon prices to Defendants' subsidiaries in the U.S., where the prices were submitted collusively.

c.    Discussing and exchanging pricing information with regard to Power Window Switches RFQs and reaching conspiratorial agreements with respect to RFQs by means of communications on multiple occasions to coordinate responses and exchanges and adjustments of Power Window Switches pricing before submission to OEMs in the United States and elsewhere.

70.    Defendants and their co-conspirators knew and intended that their actions regarding their sales of Power Window Switches to motor vehicle manufacturers would have a direct impact on prices for Power Window Switches sold by Defendants to all direct purchasers in the United States.

71.    Defendants' single price-fixing conspiracy involving Power Window Switches impacted not only multiple bids submitted to OEMs, but also the prices paid by all other direct purchasers of Power Window Switches from Defendants.

**ANTITRUST INVESTIGATION**

**A.  Government Investigations**

72.    A globally coordinated antitrust investigation is taking place in the United States, Europe, and Japan, aimed at suppliers of automotive parts.  A Japan Fair Trade Commission ("JFTC") official told a leading legal publication that automotive parts supplier investigations by the JFTC, DOJ and European Commission Competition Authority would continue to widen because the automotive industry as a whole comprises many sub-industries.  He characterized the

investigations being conducted by the U.S., European and Japanese antitrust authorities as "large and broad," and he declined to deny that this "would be history's largest case."

73.     On March 17, 2016, the DOJ announced that Defendant Omron had agreed to plead guilty to a one-count criminal information and to pay a $4.55 million criminal fine for participating in a combination and conspiracy to suppress and eliminate competition in the automotive parts industry by agreeing to allocate the supply of, to rig bids for, and to fix, stabilize, and maintain the prices of Power Window Switches.  According to the plea agreement, although the conspiratorial discussions and meetings took place throughout the United States and elsewhere, representatives of Omron participated in at least one contact with its co-conspirators that occurred in the Eastern District of Michigan.  The plea agreement further notes that the combination and conspiracy engaged in by Omron and its co-conspirators was an unreasonable restraint of interstate and foreign trade and commerce in violation of the Sherman Act, 15 U.S.C. § 1.

74.     According to the Criminal Information, Defendant Omron and its co-conspirators carried out the conspiracy by:

(a)     participating in meetings, conversations, and communications to discuss bids to be submitted to an OEM in the United States and elsewhere;

(b)     agreeing, during those meetings, conversations, and communications, on bids to be submitted to an OEM in the United States and elsewhere;

(c)     agreeing, during those meetings, conversations, and communications, to allocate the supply of Power Window Switches sold to an OEM in the United States and elsewhere on a model-by-model basis;

(d)     submitting bids to an OEM in the United States and elsewhere in accordance with the agreements reached;

(e)     selling Power Window Switches to an OEM in the United States and elsewhere at collusive and noncompetitive prices;

(f)     accepting payment for Power Window Switches sold to an OEM in the United States and elsewhere at collusive and noncompetitive prices; and

(g)     engaging in meetings, conversations, and communications for the purpose of monitoring and enforcing adherence to the agreed-upon bid-rigging.

**B.   The Likely Existence of a Cooperating Defendant**

75.     The Antitrust Criminal Penalty Enhancement and Reform Act ("ACPERA") provides leniency benefits for a participant in a price-fixing conspiracy that voluntarily discloses its conduct to the Department of Justice and cooperates fully with plaintiffs in civil antitrust litigation.  In most recent cases in which guilty pleas for price-fixing conduct have been obtained, there has been a cooperating party that has been accepted into the DOJ's ACPERA program as an "amnesty applicant."  One of the leniency benefits for a conspirator that is accepted into the ACPERA program is that it is not charged with a criminal offense and is not required to plead guilty to criminal charges.

76.     In light of the guilty plea in this case, other guilty pleas in related automotive parts antitrust cases, and the DOJ's ongoing investigation into the industry, it is reasonable for this Court to infer that there is an ACPERA "amnesty applicant" in this case.

**CLASS ACTION ALLEGATIONS**

77.     Plaintiff brings this action on behalf of itself, and, pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3), as the representative of a Class defined as follows:

> All direct purchasers of Power Window Switches (excluding Defendants and their past and present parents, subsidiaries, affiliates or joint-ventures) in the United States from any of the Defendants (or their controlled subsidiaries, affiliates, or joint-ventures) during the Class Period.

78.     Members of the Class are so numerous and geographically dispersed across the United States that joinder is impracticable.  The exact number of Class members is unknown to Plaintiff.  The identity of the members of the Class can be readily determined from information and records Defendants possess or control through their subsidiaries, affiliates or joint ventures.

79.     Plaintiff's claims are typical of the claims of the members of the Class.  Plaintiff and all members of the Class were damaged by the same wrongful conduct by Defendants, *i.e.*, they have paid artificially inflated prices for Power Window Switches as a result of Defendants' anticompetitive and unlawful conduct.

80.     Plaintiff will fairly and adequately protect and represent the interests of the Class. Plaintiff's interests are coincident with, and not antagonistic to, those of the Class.

81.     Plaintiff is represented by counsel who are experienced and competent in the prosecution of antitrust class action litigation.

82.     Questions of law and fact common to members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entire Class.  Such generally applicable conduct is inherent in Defendants' anticompetitive and unlawful conduct.

83.     There are core questions of law and fact common to the Class, such as:

a.     Whether Defendants conspired to fix, raise, maintain, or stabilize prices of, or to allocate market shares or to rig bids for, Power Window Switches;

b.     Who participated in the conspiracy and how long it lasted;

c.      Whether the conspiracy caused prices for Power Window Switches to be higher than they otherwise would have been;

d.      Whether Defendants' conduct caused injury to the business or property of Plaintiff and members of the Class;

e.      Whether Defendants' conduct violated Section 1 of the Sherman Act;

f.      Whether Defendants took actions to conceal their unlawful conspiracy; and

g.      How to measure the damages suffered by the Class.

84.     A class action is superior to the other methods available for the fair and efficient adjudication of this litigation because individual joinder of all Class members is impracticable. Individual litigation presents the potential for inconsistent judgments and would greatly increase the cost and duration of litigation for all parties and for the judicial system.  A class action permits more efficient case management and offers the benefits of unitary adjudication, economies of scale, and comprehensive supervision by a single court.

## ANTITRUST INJURY SUFFERED BY PLAINTIFF AND THE CLASS

85.     Defendants' anticompetitive conduct has had the following effects:

a.      price competition has been restrained, suppressed, or eliminated with respect to Power Window Switches;

b.      the prices of Power Window Switches have been raised, fixed, maintained, or stabilized at supra-competitive levels; and

c.      purchasers have been deprived of free and open competition in the Power Window Switches market.

86.     As a result of Defendants' contract, combination, or conspiracy, Plaintiff and other Class members paid higher prices for Power Window Switches than they would have in the absence of the conspiracy, and Plaintiff and other Class members have sustained injury to their business or property.

## PLAINTIFF'S CLAIMS ARE TIMELY

### A.  The Statute of Limitations Did Not Begin to Run Because Plaintiff Did Not And Could Not Discover Its Claims Until (at the earliest) March 17, 2016

87.     Plaintiff repeats and re-alleges the allegations set forth above.

88.     Plaintiff and the members of the Class had no knowledge of the combination or conspiracy alleged herein, or of facts sufficient to place them on inquiry notice of the claims set forth herein, until (at the earliest) March 17, 2016, the date that the DOJ publicly announced Defendant Omron's agreement to plead guilty to fixing the prices of, and rigging bids for, Power Window Switches.

89.     Information that was available to the Plaintiff and the members of the Class in the public domain prior to March 17, 2016, when the DOJ publicly announced Defendant Omron's anticipated guilty plea, was insufficient to put Plaintiff and members of the Class on notice that the Defendants were involved in a criminal conspiracy to fix prices and rig bids for Power Window Switches.  Before that date Plaintiff and the members of the Class had no means of obtaining any facts or information concerning any aspect of the Defendants' dealings with OEMs or other direct purchasers, much less the fact that they and their co-conspirators had engaged in the combination and conspiracy alleged herein.

90.     For these reasons, the statute of limitations as to Plaintiff and the Class's claims did not begin to run, and has been tolled with respect to the claims that Plaintiff and the members of the Class have alleged in this Complaint.

### B.   Fraudulent Concealment Tolled the Statute of Limitations

91.     In the alternative, application of the doctrine of fraudulent concealment tolled the statute of limitations on the claims asserted herein by Plaintiff and the Class.  Plaintiff and the members of the Class did not discover, and could not have discovered through the exercise of reasonable diligence, the existence of the conspiracy alleged herein until March 17, 2016, when the DOJ publicly announced Defendant Omron's anticipated guilty plea.

92.     Before that date, Plaintiff and members of the Class were unaware of the Defendants' unlawful conduct, and did not know that they were paying supracompetitive prices for Power Window Switches throughout the United States during the Class Period.   No information, actual or constructive, was ever made available to Plaintiff and the members of the Class that even hinted that they were being injured by the Defendants' unlawful conduct.

93.     The affirmative acts of the Defendants alleged herein, including acts in furtherance of the conspiracy, were wrongfully concealed and carried out in a manner that precluded detection.

94.     Specifically, as United States Attorney General Eric Holder explained in connection with the DOJ's globally coordinated investigation into price-fixing in the automotive parts industry, "[i]n order to keep their illegal conduct secret, [Defendants] used code names and met in remote locations."

95.     By its very nature, the Defendants' and their co-conspirators' anticompetitive conspiracy was inherently self-concealing.   Power Window Switches are not exempt from antitrust regulation, and thus, before March 17, 2016, Plaintiff reasonably considered the Power Window Switches industry to be a competitive industry.  Accordingly, a reasonable person under the circumstances would not have been alerted to the need to investigate the legitimacy of the Defendants' Power Window Switches prices before March 17, 2016.

96.     Plaintiff and the members of the Class could not have discovered the alleged contract, conspiracy or combination at an earlier date by the exercise of reasonable diligence because of the deceptive practices and techniques of secrecy employed by the Defendants and their co-conspirators to avoid detection of, and to fraudulently conceal, their contract, combination, or conspiracy.

97.     Because the alleged conspiracy was both self-concealing and was affirmatively concealed by the Defendants and their co-conspirators, Plaintiff and members of the Class had no knowledge of the alleged conspiracy, or of any facts or information that would have caused a reasonably diligent person to investigate whether a conspiracy existed, until March 17, 2016, when the DOJ publicly announced Defendant Omron's anticipated guilty plea.

98.     For these reasons, the statute of limitations applicable to Plaintiff's claims has been tolled.

## COUNT I:  CLAIM FOR VIOLATION OF SECTION 1 OF THE SHERMAN ACT

99.     Plaintiff incorporates by reference the allegations set forth above as if fully set forth here.

100.    Defendants entered into and engaged in a contract, combination, or conspiracy in an unreasonable restraint of trade in violation of Section 1 of the Sherman Act.

101.    The acts done by each of the Defendants as part of, and in furtherance of, the contract, combination, or conspiracy were authorized, ordered, or done by their officers, agents, employees, or representatives while actively engaged in the management of Defendants' affairs.

102.    Commencing at least as early as January 1, 2003, and continuing for many years, the exact dates being currently unknown to Plaintiff, Defendants entered into a continuing

agreement, understanding, or conspiracy in restraint of trade to artificially fix, raise, stabilize, or maintain prices for Power Window Switches, creating anticompetitive effects.

103.    Defendants' anticompetitive acts were intentionally directed at the United States market and had a substantial and foreseeable effect on interstate commerce by raising and fixing prices for Power Window Switches throughout the United States.

104.    As a result of the conspiracy alleged herein, the prices charged to Plaintiff and the other members of the Class for Power Window Switches were unlawfully raised, fixed, maintained, or stabilized in the United States.

105.    The conspiracy has had the following effects:

a.    prices paid by Plaintiff and the Class for Power Window Switches were raised to, or fixed, maintained, or stabilized at, non-competitive levels;

b.    Plaintiff and the Class have been deprived of the benefits of free, open, and unrestricted competition in the market for Power Window Switches; and

c.    competition in the market for Power Window Switches has been unlawfully restrained, suppressed, or eliminated.

106.    As a direct and proximate result of Defendants' unlawful conduct, Plaintiff and the Class have been damaged, and will continue to be damaged, by paying supra-competitive prices that they would not have had to pay in the absence of the unlawful conduct of Defendants as alleged herein.

107.    The conspiracy is a *per se* violation of the federal antitrust laws.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in its favor and in favor of the Class herein, and respectfully requests the following relief:

A.      That the Court determine that this action may proceed as a class action under Rule 23 of the Federal Rules of Civil Procedure, with Plaintiff as the designated Class representative and their counsel as Class Counsel;

B.      That the contract, combination or conspiracy, and the acts done in furtherance thereof by Defendants and their co-conspirators as alleged in this Complaint, be adjudicated and decreed a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

C.      That Plaintiff and the Class recover damages sustained by them, as provided by the federal antitrust laws, and that a joint and several judgment in favor of Plaintiff and the Class be entered against the Defendants in an amount to be trebled in accordance with the antitrust laws pursuant to 15 U.S.C. § 15(a);

D.      That Defendants, their subsidiaries, affiliates, successors, transferees, assignees, and the respective officers, directors, partners, agents and employees thereof, and all other persons acting or claiming to act on their behalf, be permanently enjoined and restrained from continuing and maintaining the combination, conspiracy or agreement alleged herein;

E.      That Plaintiff and the Class recover their costs of this suit, including reasonable attorneys' fees as provided by law;

F.      That Plaintiff and the Class be awarded pre-judgment and post-judgment interest in accordance with law; and

G.      That Plaintiff and the Class receive such other or further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all issues so triable.

Dated: June 29, 2018                          /s/ David H. Fink
                                              David H. Fink (P28235)
                                              Darryl Bressack (P67820)
                                              Nathan J. Fink (P75185)
                                              FINK + ASSOCIATES LAW
                                              38500 Woodward Avenue; Suite 350
                                              Bloomfield Hills, MI 48304
                                              Telephone: (248) 971-2500
                                              dfink@finkandassociateslaw.com
                                              dbressack@finkandassociateslaw.com
                                              nfink@finkandassociateslaw.com

                                              *Interim Liaison Counsel for the Direct
                                              Purchaser Plaintiffs*

                                              Gregory P. Hansel
                                              Randall B. Weill
                                              Michael S. Smith
                                              PRETI, FLAHERTY, BELIVEAU
                                                 & PACHIOS LLP
                                              One City Center
                                              P.O. Box 9546
                                              Portland, ME 04112-9546
                                              Telephone: (207) 791-3000
                                              ghansel@preti.com
                                              rweill@preti.com
                                              msmith@preti.com

                                              Joseph C. Kohn
                                              William E. Hoese
                                              Douglas A. Abrahams
                                              KOHN, SWIFT & GRAF, P.C.
                                              1600 Market St; Suite 2500
                                              Philadelphia, PA 19107
                                              Telephone: (215) 238-1700
                                              jkohn@kohnswift.com
                                              whoese@kohnswift.com
                                              dabrahams@kohnswift.com

Steven A. Kanner
William H. London
Michael E. Moskovitz
FREED KANNER LONDON & MILLEN LLC
2201 Waukegan Road, Suite 130
Bannockburn, IL 60015
Telephone: (224) 632-4500
skanner@fklmlaw.com
wlondon@fklmlaw.com
mmoskovitz@fklmlaw.com

Eugene A. Spector
William G. Caldes
Jonathan M. Jagher
Jeffrey L. Spector
SPECTOR ROSEMAN & KODROFF
1818 Market Street, Suite 2500
Philadelphia, PA 19103
Telephone: (215) 496-0300
espector@srkattorneys.com
bcaldes@ srkattorneys.com
jjagher@ srkattorneys.com
jspector@ srkattorneys.com

*Interim Co-Lead Counsel for*
*Direct Purchaser Plaintiffs*

Joseph M. Fischer
CARSON FISCHER, P.L.C.
4111 Andover Road West - Second Floor
Bloomfield Hills, MI 48302-1924
Telephone:  (248) 644-4840
jfischer@carsonfischer.com

Solomon B. Cera
Thomas C. Bright
Pamela A. Markert
CERA LLP
595 Market Street, Suite 2300
San Francisco, CA 94105-2835
Telephone: (415) 777-2230

*Counsel for Plaintiff*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on June 29, 2018 I electronically filed the foregoing paper with the Clerk of the court using the ECF system which will send notification of such filing to all counsel of record registered for electronic filing.

FINK + ASSOCIATES LAW

By: /s/ Nathan J. Fink
Nathan J. Fink (P75185)
38500 Woodward Ave., Suite 350
Bloomfield Hills, MI  48304
(248) 971-2500
nfink@finkandassociateslaw.com